382 So.2d 945 (1980)
Fred DANIELS
v.
Halcott L. CONN et al. and State of Louisiana.
Nos. 66104, 66416.
Supreme Court of Louisiana.
April 7, 1980.
*946 James J. Brady, Gravel, Roy & Burnes, Alexandria, for defendant-applicant in 66416 and for defendant-respondent in 66104.
Steven R. Giglio, Louisiana Dept. of Health and Human Resources, Baton Rouge, for defendant-applicant in 66104 and for defendant-respondent in No. 66416.
Kramer & Davis, James M. Buck, Antoon, Dalrymple & Beck, Joseph T. Dalrymple, Alexandria, for plaintiffs-respondents in both cases.
GULOTTA, Justice Ad Hoc.
Plaintiff, the father of a mentally retarded young man killed in a pedestrian-automobile accident while a resident at Pinecrest State School, was awarded a judgment against the State of Louisiana and also Halcott L. Conn, a Pinecrest employee *947 and driver of the vehicle.[1] Based on a showing of Conn's inability to respond to the fullest extent of the $35,000 damage award, the trial judge held the State of Louisiana and Halcott L. Conn liable in solido for $6,000. He held the State solely liable for the remaining $29,000.
Concluding that the "inability of a defendant to pay" doctrine is inapplicable when a joint tortfeasor, liable in solido, is solvent, the court of appeal amended the trial court's judgment to hold the State of Louisiana and Halcott Conn liable in solido for the entire amount of the $35,000 award.
Both the State and Conn applied for writs to this Court and both applications were granted. The State complains that the trial judge and the court of appeal erred in concluding that the Pinecrest State School breached its duty of care to protect the resident, Roy Daniels. Recognizing the school's duty to promote patient safety, the State contends it provided reasonable care to properly and adequately supervise Daniels, consistent with his particular needs, and also with the approved open therapeutic treatment program followed at Pinecrest.
Defendant Conn contends the court of appeal erred in holding that the inability to pay rule is inapplicable where there is a solvent joint tortfeasor liable in solido with the insolvent tortfeasor. Conn argues the trial judge properly applied the rule in concluding that Conn could respond only to the extent of $6,000 of the $35,000 judgment.
We find no error by either the trial judge or the court of appeal in concluding that the State of Louisiana and Halcott Conn are joint tortfeasors. Moreover, we find the court of appeal correctly refused to apply the inability to pay rule under the circumstances in this case. Accordingly, we affirm the court of appeal judgment.
Roy Daniels had been a patient at the Pinecrest State School for approximately 12 years before the accident occurred. His chronological age was 28, but his mental age was seven and one-half years,[2] as determined by the trial judge and supported by the record. On November 12, 1977 he was killed when struck by a car driven by Halcott Conn. Conn, an electrician employed by the school, was returning to his employer-provided residence located on the school grounds. At the time of the accident, Roy was walking near the middle of one of the school's main two-way streets, pulling a small wagon containing phonograph records and recording equipment. As had been his usual duty over a period of more than ten years, Roy was transporting the records, which had been played at a school dance earlier that evening. He was taking the records from a recreation hall on the school grounds to the office where the records were kept.
According to Conn, on the Saturday night on which the accident occurred, he was returning to his home at approximately 8:15 p. m. He testified that he had left the grounds about 3 p. m. that day to go hunting. Returning from his outing, he had stopped on his way home at a bar, where he drank approximately five beers. The weather was clear, and there were no curves in the roadway approaching the accident site. It was dark, but the street was lighted with street lights.
Conn stated that he saw Roy approximately twelve feet in front of the automobile, but was unable to stop in time to avoid hitting him. Roy was walking in the direction of the oncoming automobile, near or in the middle of the street, pulling the wagon. Conn was traveling approximately 25 mph in the posted 15 mph area. According to the investigating Louisiana State Police officer, the intoximeter test and his own observations confirmed that Conn was *948 intoxicated at the time of the accident. There were no skid marks at the scene.

LIABILITY OF HALCOTT CONN
Conn's liability is undisputed. The circumstances surrounding the accident clearly established Conn's liability for Roy Daniels' death. Furthermore, no serious contention is made before this Court that plaintiff's claim is barred by Roy's contributory negligence.

LIABILITY OF THE STATE OF LOUISIANA
A. RESPONDEAT SUPERIOR
In his "tentative" oral findings of fact, apparently dictated immediately after the matter was submitted, the trial judge concluded that no showing had been made to establish liability of the State based on respondeat superior. Although the court of appeal did not address the respondeat superior question, we feel compelled to do so. Conn was an employee of Pinecrest State School, which was under the supervision of Louisiana Department of Health and Human Resources, a state agency.
The question arises whether, at the time of the accident, while returning to his employer-furnished home on the school grounds after normal working hours, he was within the course and scope of his employment. The test to be applied was whether he was performing some function for his employer and for which he was employed. LSA-C.C. art. 2320; Orgeron v. Sweatman, 367 So.2d 1199 (La.App. 4th Cir. 1978), writ denied, Cheramie v. Sweatman, La., 371 So.2d 615. More specifically, the inquiry is whether the employee's tortious conduct "was so closely connected in time, place and causation to his employment duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests." LeBrane v. Lewis, 292 So.2d 216, 218 (La. 1974).
The resolution of this issue, as we view it, depends to a large extent on whether Conn, employed as an electrician, was on duty after working hours at the time of the Saturday night accident, regardless of the fact that he was returning to his employer-furnished house located on the school grounds. In this connection Conn testified that he was paid a monthly salary, lived on the grounds, and was subject to 24-hour call if emergencies arose. Normal working hours for electricians were 7:30 a. m. to 4 p. m., Monday through Friday. Although there were other electricians employed by the school, only Conn and Donald Guadagnoli, the electrician foreman, lived on the school grounds in housing provided by Pinecrest. According to Conn, he was on call every Saturday and Sunday, except when arrangements were made for other people to be on call. He described "on call" as being available for emergency calls after 4 p. m. and being able to respond to an emergency within 30 minutes of the call. This required informing his wife or others where he could be located in the event he was not at home. He stated that on the night of the accident, he was on call and was returning home for that purpose.
According to Guadagnoli, however, he was on duty on the weekend of the accident, while Conn had the weekend off. Guadagnoli testified that another electrician had worked on Saturday from 7:30 to 4 p. m. and Guadagnoli's on-call duty for emergencies commenced at 4 p. m. The foreman stated that he had received and responded to two calls on that evening. He explained that the electricians who lived on the grounds are not necessarily on call on a 24-hour basis. The agreement among them was that each would work every third or fourth weekend. He further testified there were two or three other electricians in addition to Conn and himself. Conn disagreed with Guadagnoli's testimony that Conn had not been on duty on the fateful Saturday night.
Coates Stuckey, the school administrator, corroborated Guadagnoli's testimony. He stated that employees who lived on the grounds were not expected to be on call 24 *949 hours a day, seven days a week, 365 days a year. According to Stuckey, usually the electrician foreman and the electrician living on the grounds reached an understanding that one or the other would be on call during off hours.
In the trial judge's "tentative findings", he accepted Guadagnoli's testimony regarding whether Conn was on call on the night of the accident. This finding obviously is based on a credibility determination. Considering Conn's activities on November 12th, together with Guadagnoli's testimony and its corroboration by Stuckey, we are led to conclude, as did the trial judge, that Conn was not "on duty" on the date of the accident. Having so concluded, we find no error in the trial court's rejection of liability against the State based on respondeat superior.
B. FAILURE TO PROVIDE SUPERVISION AND PROTECT DECEDENT
In Hunt v. Bogalusa Medical Center, 303 So.2d 745, 747 (La.1974), this Court, setting forth the care required to be exercised toward a patient, stated:
"A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case."
We accept the State's argument that recent legislation amending the Louisiana Mental Health Law reflects "legislative resolve to provide involuntary treatment that is at once `medically appropriate' and `least restrictive of the patient's liberty'."[3] Nevertheless, we conclude under the circumstances of this case that the State failed to provide proper supervision and care to protect Roy Daniels from danger. The risk of injury by vehicles is within the ambit of the duty of care and supervision the Pinecrest State School owed this particular resident.
According to Stuckey, there are approximately 2100 residents and 1700 employees at Pinecrest. There are paved and blacktopped roads traversing the approximately 300-acre grounds. Vehicles enter and leave the school grounds through one entrance, and the balance of the area is completely fenced. Stuckey testified that a security officer is at the gate from 7 a. m. to 4 p. m., seven days a week. After 4 p. m., the entrance to the school grounds is unattended and open, permitting vehicles to enter and leave at any time, as there actually was no gate at the entrance. One patrol car makes rounds of the area after 4 p. m., and makes routine checks of the entrance. Significantly, Stuckey testified that the school did have problems in the nature of people driving too fast on the grounds. The purpose of the patrol was to curtail this driving at excessive speeds, and there were speed limit signs posted throughout the school grounds. Stuckey also testified there were mercury vapor lights along the streets that operated on a photo-electric switch, going on at sundown and off at sunrise.
Eddie Gaspard, a security officer at Pinecrest, stated that the sign at the gate merely stated "Drive Carefully". It did not indicate that pedestrians had the right-of-way. According to Gaspard, there was a traffic sign in the area of the accident which stated, "Stop for Pedestrians in Crosswalk". He testified that classes on safety were conducted and that in some areas of the school grounds there were sidewalks, but in others there were none. There were no "safety bumps" on the street to force vehicular traffic to maintain a slower speed. Residents were given the right-of-way over vehicular traffic and patients generally were allowed to roam freely around the campus grounds. According to Gaspard, Pinecrest depends to a large extent on the discretion of adult drivers.
*950 Gaspard also testified that he knew Roy and was aware that Roy had a habit of walking in the middle of the street. He had cautioned Roy on several occasions to get on the sidewalk or to walk on the side of the street, particularly when he was pulling his wagon or riding a bicycle. He stated that he had never talked about Roy's dangerous habit to persons responsible for Roy's privileges and responsibilities.
Coates Stuckey and Peter Chandler (the assistant superintendent and director of psychological services at the institution) explained that the extent of the privileges and supervision accorded to each resident is determined by a committee. This committee is usually composed of a physician, a social worker, a pathologist and a staff representative living on the school grounds. Chandler described the school as a free-open environment, conducive to and leading to a more rapid improvement. He stated that residents had freedom to move as they willed. Based on his observations of Roy, Chandler did not feel that additional supervision or restrictions were required for him. He pointed out that Roy had permission to go off the school grounds. According to Chandler, Roy was in the upper population group which required less supervision, but he did not have total freedom. He had a work responsibility, was assigned to a job, and was supervised within limits. According to Chandler, merely because a resident violated traffic safety regulations did not necessarily mean he should be more closely supervised. Chandler did state, however, that if a patient habitually walked into the street, or disregarded the vehicular traffic, he might require an attendant or an escort.
Royce Eznak, the recreation supervisor, testified he knew Roy and had watched Roy on the night of the accident as he left the dance to transport the records. Roy was alone and unescorted. The distance he had to cross between the recreation hall and the office was approximately three or four blocks. According to Eznak, some patients were brought to and from the recreation hall in buses. Those who walked traveled in groups supervised by employees. Eznak testified that, had he seen Roy pulling the wagon in the middle of the street prior to the accident that evening, he would have attempted to supervise, lead or help him. Significantly, Eznak testified that on the night of the accident, an employee had preceded Roy by bus in order to open the gate at the entrance of the office where the records were stored. The employee went by bus. Roy walked unescorted.
Stuckey described Roy as one who had a great love for people, liked to be included in things, was quick to learn, and took pride in his work. All things considered, Stuckey stated, Roy had an unusual mechanical aptitude. Stuckey indicated that Roy did not require an escort. He had been allowed to leave Pinecrest unescorted, in the daytime, on three separate occasions. On other occasions, he had been permitted to leave the school grounds accompanied either by an employee or by his family. Stuckey testified that Roy was not capable of living in society away from Pinecrest without supervision. Neither Roy nor other residents were permitted to be off campus after dark, unescorted.
The Pinecrest school grounds were an open environment, in which vehicles had complete and unrestricted freedom to enter in evenings, and there were 1700 employees who had access and use of these streets. There were no protective street barriers to reduce the vehicular speed. Moreover, the school failed to provide an escort to, or to supervise at night, a patient known to have a seven and one-half year old mentality and a habit of walking in the middle of the street. Considering all these circumstances, we are led to conclude, as did the trial judge and the court of appeal, that the state school violated its duty to Roy by failing to provide adequate supervision for his safety. Although we recognize the therapeutic value of encouraging residents to be more self-reliant, the scope of the school's duty encompassed the risk that Roy might be struck by an automobile while walking unescorted at night on the school grounds. The injury was foreseeable, regardless of whether or not the driver was intoxicated. Accordingly, we conclude the *951 trial judge and the court of appeal were correct in finding the State of Louisiana liable.

QUANTUM
The trial judge awarded plaintiff $35,000 in general damages for loss of love and affection. He made no award for pain and suffering because the evidence showed Roy was knocked unconscious by the accident and remained in that condition until he died a few hours later, while being transported in an ambulance to a Baton Rouge hospital. We conclude under these circumstances, plaintiff failed to show entitlement to damages for pain and suffering. Both plaintiff and Roy's sister, however, testified regarding the close relationship between Roy and his father. Fred Daniels made faithful visits to the school approximately twice a month. On holidays and on other occasions, he took Roy home on visits, as well as on hunting trips. His description of the enjoyment both he and Roy derived from these visits were corroborated by Roy's sister. This evidence considered, we find no abuse of discretion in the amount of the award for loss of love and affection.

APPORTIONMENT OF THE AWARD
Based on testimony that Halcott Conn was impecunious at the time of trial,[4] the trial judge invoked the "inability to pay" doctrine and limited Halcott Conn's in solido liability with the State to $6,000. In addition, the judge held the State solely liable for an additional $29,000. The court of appeal reversed, concluding that where one of several joint tortfeasors is solvent, the rule requiring the court to consider a defendant's inability to pay is inapplicable. The thrust of Conn's argument is that the court of appeal erred in refusing to consider his inability to pay and in holding him liable in solido with the State for the entire $35,000 award.
The inability to pay rule was recognized as early as 1886 in the case of Williams v. McManus, 38 La.Ann. 161. In that case, in an action for damages for slander, the court pointed out, in passing, that the defendant was a "laborer" and of "limited means" and that the jury had not made a "proper and commensurate allowance and went beyond the limits to be observed in such cases." The court then reduced the judgment from $2,000 to $500. See also, Loyacano v. Jurgens, 50 La.Ann. 441, 23 So. 717 (1898), in which the court stated that a person's circumstances may be considered in estimating damages to be awarded in a personal injury case. The obvious purpose of the rule is based on the equitable principle that courts will not grant vain and useless relief or render a judgment incapable of execution. Williams v. Garner, 268 So.2d 56 (La.App. 1st Cir. 1972).[5]
Recognition of the inability to pay doctrine is not the problem in the instant case. Rather, the question is whether the doctrine is applicable where there are joint tortfeasors liable in solido, one solvent and the other insolvent. Relying on LSA-C.C. arts. 2098, 2103, 2104 and 2324,[6] and Quatray *952 v. Wicker, 178 La. 289, 151 So. 208 (1933), the State argues that a debtor's insolvency is a personal defense which may be asserted only when the solvent co-debtor seeks contribution from the insolvent co-debtor after payment of the judgment or obligation. Accordingly, the State contends that any evidence of the defendant's inability to pay is premature, and inadmissible, in determining the amount to be awarded to a plaintiff on the trial on the merits in a tort suit. We agree.
In Howell v. Knight, 193 So.2d 282 (La.App. 1st Cir. 1966), the court stated that where codefendants are cast jointly and in solido, the evidence must show the inability of all defendants to respond before a judgment is rendered in a lesser amount than would ordinarily be assessed against solvent defendants. In the instant case, defendant Conn acknowledges that where there exist solvent and insolvent co-debtors in solido, evidence of insolvency may not be considered for the purpose of reducing the amount to be awarded plaintiff. He contends, nevertheless, that such evidence is admissible at trial on the merits, as between the co-obligors, to limit the liability of the insolvent defendant. We do not agree. LSA-C.C. art. 2324 provides:
"He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act."[7]
As this article states, each joint tortfeasor is liable to the fullest extent for the damages caused plaintiff. See also, LSA-C.C. art. 2315 and 2091.[8] Because either of *953 the two solidary obligors may be responsible for payment of the amount of the judgment, the inability of one solidary co-obligor to pay does not become relevant until the solvent co-obligor seeks contribution from the insolvent one.
In Brown v. New Amsterdam Casualty Company, 243 La. 271, 142 So.2d 796 (1962), this Court stated that although the injured party's cause of action against either or both of two joint tortfeasors comes into being and the obligation of each tortfeasor to the injured party commences at the time a tort is committed, the rights and obligations as between the joint tortfeasors do not then arise, because the obligations between the joint tortfeasors are not created by the commission of the tort, but rather spring from the principle of contribution.
In accordance with Brown, we conclude that where there are solvent and insolvent joint tortfeasors liable in solido, evidence of the insolvent defendant's inability to pay may not be considered by the trial judge in determining damages to be awarded to the plaintiff, or in apportioning damages as between those joint tortfeasor defendants at the trial on the merits of plaintiff's claim. Having so concluded, we affirm the judgment of the court of appeal, with the exception that costs are to be paid by the State. As amended, affirmed.
AMENDED AND AFFIRMED.
DIXON, C. J., concurs with reasons.
EDWARD A. de la HOUSSAYE, J. ad hoc, concurs and assigns reasons.
MARCUS, J., dissents and assigns reasons.
DIXON, Chief Justice (concurring).
In addition, since Conn lived on the grounds as a condition of his employment, respondeat superior should apply.
EDWARD A. de la HOUSSAYE, Justice Ad Hoc, concurring.
I concur with the majority decision affirming the award to plaintiff; finding liability on defendants Daniels and the State of Louisiana, in solido, and the quantum of damages.
However, in discussing the apportionment of the award, the majority appears to adopt a rule that
"where there are solvent and insolvent tortfeasors liable in solido, evidence of the insolvent defendant's inability to pay may not be considered by the trial judge (trier of fact) in determining damages to be awarded to the plaintiff, or in apportioning damages as between those joint tortfeasor defendants at the trial on the merits of plaintiff's claim."
If I interpret this, and other language in the opinion correctly, the majority would preclude the admissability of evidence, at the trial on the merits, of defendant's inability to pay, in assessing damage.
This view is, in my judgment, incorrect. Initially, it would appear that no determination can be made as to which, if any, defendants at trial, either solvent or insolvent, are liable, until the trier of the facts has rendered a verdict. It may only then be determined which of the defendants, if any, are held liable. If only the solvent defendant(s) are cast, no problem arises. But if only the insolvent defendant is held liable, or if the insolvent and solvent defendant(s) are held liable in solido, after verdict, and the insolvent defendant has been precluded from admitting evidence of his inability to pay, how then could that insolvent defendant limit his liability?
It would appear to me the better rule would be to allow the insolvent, or impecunious defendant to introduce evidence at trial of his inability to pay, and after verdict *954 on the issue of liability of the parties, allow the trier of the fact to determine the issue of the insolvent defendants' inability to pay.
I do not reach the issue of contribution between joint tortfeasors, liable in solido, as that issue is not before us.
MARCUS, Justice (dissenting).
I agree with all findings of the majority except its finding that the state is liable. I consider the state provided reasonable care and adequately supervised Daniels, consistent with his particular needs, and also with the approved open therapeutic treatment program following at Pinecrest. Accordingly, the award for damages should be limited to six thousand dollars in view of Conn's inability to pay. I respectfully dissent.
NOTES
[1] A curator ad hoc was appointed to represent Ruby Howell Daniels, absentee mother of the decedent and divorced wife of plaintiff. Her intervention in the suit was dismissed with prejudice, and there was no appeal on her behalf.
[2] Roy was described by the director of psychological services at Pinecrest as educable or mildly mentally retarded, with an I.Q. range of between 49 and 60.
[3] LSA-R.S. 28:1 et seq., as amended by Acts 1977, No. 714, § 1; Acts 1978, No. 680, § 1; Acts 1978, No. 782, § 1, effective July 17, 1978. See also, 52 Tul.L.Rev. 542 at 544, 545 (1978).
[4] Conn testified that he was not working due to a ruptured disc, nor was he receiving workmen's compensation, and he had no income other than that derived from his wife's occasional substitute teaching. He testified he owned two acres of land on which is a small house in disrepair, having an approximate value of $5,000; that he had three children, ages 16, 14 and 7; and that he and his family existed on loans from his brother-in-law. Conn was an uninsured motorist at the time of the accident.
[5] This well-established rule has been followed by the courts of this state in numerous cases. See e. g., Nugent v. U-Haul Company, 368 So.2d 781 (La.App. 2nd Cir. 1979); Tarver v. U-Haul Company, Inc., 362 So.2d 1157 (La.App. 2nd Cir. 1978); Barnett v. Vanney, 360 So.2d 617 (La.App. 4th Cir. 1978); Landry v. Martin, 353 So.2d 449 (La.App. 3rd Cir. 1977), writ denied, La., 355 So.2d 257; Raggio v. Volkswagen Insurance Company, 327 So.2d 505 (La.App. 3rd Cir. 1976); Urk v. Southern Farm Bureau Casualty Insurance Co., 181 So.2d 69 (La.App. 2nd Cir. 1965), writ denied, 248 La. 909, 182 So.2d 661.
[6] Arts. 2098, 2103, 2104 and 2324 read as follows:

"Art. 2098. A codebtor in solido, being sued by the creditor, may plead all the exceptions resulting from the nature of the obligation, and all such as are personal to himself, as well as such as are common to all the codebtors.
He can not plead such exceptions as are merely personal to some of the other codebtors."
"Art. 2103. When two or more debtors are liable in solido, whether the obligation arises from a contract, a quasi contract, an offense, or a quasi offense, it should be divided between them. As between the solidary debtors, each is liable only for his virile portion of the obligation.
A defendant who is sued on an obligation which, if it exists, is solidary may seek to enforce contribution, if he is cast, against his solidary co-debtor by making him a third party defendant in the suit, as provided in Article [Articles] 1111 through 1116 of the Code of Civil Procedure, whether or not the third party defendant was sued by the plaintiff initially, and whether the defendant seeking to enforce contribution if he is cast admits or denies liability on the obligation sued on by the plaintiff. (As amended by Acts 1960, No. 30, § 1, effective Jan. 1, 1961.)"
"Art. 2104. If one of the codebtors in solido pays the whole debt, he can claim from the others no more than the part and portion of each.
If one of them be insolvent, the loss occasioned by his insolvency must be equally shared amongst all the other solvent codebtors and him who has made the payment."
"Art. 2324. He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act."
[7] With the establishment of comparative negligence in Louisiana by Act 431 of 1979, Art. 2324 has been changed to provide for apportionment of damages among in solido joint tortfeasors according to degrees of negligence.

However, section 4 of the Act provides it shall not apply to claims arising from events that occurred prior to the effective date of the Act (Aug. 1, 1980).
[8] Arts. 2315 and 2091 read as follows:

"Art. 2315. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
The right to recover damages to property caused by an offense or quasi offense is a property right which, on the death of the obligee, is inherited by his legal, instituted, or irregular heirs, subject to the community rights of the surviving spouse.
The right to recover all other damages caused by an offense or quasi offense, if the injured person dies, shall survive for a period of one year from the death of the deceased in favor of: (1) the surviving spouse and child or children of the deceased or either such spouse or such child or children; (2) the surviving father and mother of the deceased, or either of them, if he left no spouse or child surviving; and (3) the surviving brothers and sisters of the deceased, or any of them, if he left no spouse, child, or parent surviving. The survivors in whose favor this right of action survives may also recover the damages which they sustained through the wrongful death of the deceased. A right to recover damages under the provisions of this paragraph is a property right which, on the death of the survivor in whose favor the right of action survived, is inherited by his legal, instituted, or irregular heirs, whether suit has been instituted thereon by the survivor or not.
As used in this article, the words `child', `brother', `sister', `father', and `mother' include a child, brother, sister, father, and mother, by adoption, respectively. (As amended by Acts 1960, No. 30, § 1, effective Jan. 1, 1961)."
"Art. 2091. There is an obligation in solido on the part of the debtors, when they are all obliged to the same thing, so that each may be compelled for the whole, and when the payment which is made by one of them, exonerates the others toward the creditor."