660 So.2d 508 (1995)
Evans and Shirley SCHEXNEIDER, Plaintiffs-Appellees,
v.
LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, Defendant-Appellant.
No. 95-32.
Court of Appeal of Louisiana, Third Circuit.
June 14, 1995.
Rehearing Denied October 10, 1995.
*509 J. Clemille Simon, for Evans & Shirley Schexneider.
Robert L. Bussey, for La. Dept. of Health & Hospitals.
Miles A. Matt, for J. Minos Simon.
Before DOUCET, C.J., and THIBODEAUX and PETERS, JJ.
PETERS, Judge.
The plaintiffs, Evans and Shirley Schexneider, are the parents of Peggy Sue Schexneider, who died at the Pinecrest Development *510 Center in Rapides Parish, Louisiana, on March 10, 1992. They brought wrongful death and survival actions against the Louisiana Department of Health and Hospitals seeking to recover damages suffered as a result of their daughter's death. The trial court rendered judgment in favor of the plaintiffs awarding each $150,000.00 in general damages and $8,594.00 in funeral expenses for Peggy Sue's wrongful death but rejected the survival action. The defendant has appealed. The plaintiffs have answered the appeal seeking reversal of the survival action denial as well as an increase in the award for wrongful death. Additionally, the plaintiffs seek recognition of certain expenses as court costs.

DISCUSSION OF THE RECORD
Seven children were born of the marriage of Evans and Shirley Schexneider. One of these children, Peggy Sue, was born on April 23, 1958. At birth, Peggy Sue appeared to be a healthy baby, but within four months after her birth, she experienced her first seizure. Medical tests revealed that Peggy Sue suffered from epilepsy and mental retardation.
Peggy Sue's parents attempted to maintain her in their home, but the problems associated with her condition became so insurmountable that they were advised to have her placed in a facility for children with similar mental and physical disabilities. On October 28, 1963, Peggy Sue was placed in Pinecrest Development Center, a facility in Pineville, Louisiana, operated by the Louisiana Department of Health and Hospitals. Peggy Sue remained at Pinecrest Development Center until her death on March 10, 1992.
On the evening of March 10, 1992, Peggy Sue attempted to bathe unattended and unsupervised. Sometime after she began her bath, she was discovered seated in the bathtub, slumped forward with her mouth and nose submerged in the water. Despite CPR efforts of several Pinecrest and emergency medical personnel, Peggy Sue died. An autopsy revealed that the cause of death was drowning. The parents then brought this action for damages.

ANALYSIS

Wrongful Death Action
The surviving parents of one who dies due to the fault of another may recover damages for their loss if the deceased left no spouse or children. La.Civ.Code art. 2315.2(A)(2). Peggy Sue was never married and never had any children. Therefore, the plaintiffs are entitled to recover for their loss. The defendant contends the award of $150,000.00 per parent is excessive, and the plaintiffs contend it is abusively low.
A reviewing court should not disturb the trial court's award of general damages absent an initial determination that the trial court abused its very great discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the supreme court recently gave additional guidance to the courts of appeal in the standards to be applied in reviewing general damage awards:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
*511 The defendant contends that the testimony presented by the plaintiffs relates primarily to their relationship with Peggy Sue as it existed during Peggy Sue's childhood and that this relationship did not remain so close over the years as to justify an award of $150,000.00 for each parent. The defendant points out that Peggy Sue was only five years old when she left her parents home and had lived at Pinecrest almost twenty-nine years at the time of her death. In its reasons for judgment, the trial court considered the entire history of the relationship between Peggy Sue and her parents and made the following findings of fact:
Shirley Schexneider gave birth to a healthy baby girl on April 23, 1958. Her parents named her Peggy. When Peggy was three-and-one-half months old, she had her first epileptic seizure. Her parents were told that the seizure was caused by a high fever associated with a tonsillitis condition that Peggy had. However, the seizures persisted even after her tonsils were removed.
Decedent's condition required a lot of care, time, and attention. Plaintiffs tried to care for her, but found it too difficult and enrolled her in Pinecrest when she was five years old. However, Decedent's parents would bring Peggy home on home furloughs. The evidence reflects that these were very precious visits with her family. Decedent would go to restaurants, church, the park, visit relatives, and sing carols with her family. Decedent participated in all the activities that her family had or did. Although her intelligence level was that of a one-and-one-half to three year old, she participated to the same degree as a child of that age.
Decedent was allowed to spend a maximum of forty-five days on home furloughs or visits per year. Decedent's parents took advantage of almost all of these days, absent any illness or accident of Decedent. The family not only brought Decedent home, they would also occasionally visit her at Pinecrest. These visits were terminated because Decedent would become upset and violent when her family would try to leave; consequently, they decreased the frequency of their Pinecrest visits.
Decedent's parents continued to show great interest in their daughter's care and progress. They would call and talk with Decedent on the phone. Shirley Schexneider would also write to the Social Services Department at Pinecrest to inquire as to Decedent's health and well-being; further, she wanted to find out how she could better help Decedent. Additionally, according to an Interdisciplinary Team Annual Report of February 24, 1992, Decedent's interaction with her family was excellent.
Findings of fact by the trial court may not be set aside by this court unless they are found to be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The trial court heard the testimony of the witnesses involved and was able to evaluate that testimony. We do not find that the trial court's findings of fact are clearly wrong, nor do we find that the trial court abused its discretion in awarding wrongful death damages in the amount of $150,000.00 to each parent.

Survival Action
In the event a person injured by the fault of another dies and leaves no surviving spouse or children, the injured person's parents acquire the right to recover all damages suffered by the injured person prior to his or her death. La.Civ.Code art. 2315.1(A)(2). In this case, Peggy Sue Schexneider's parents are entitled to recover for any pain and suffering she experienced in the accident which caused her death. The burden is on the plaintiffs to establish these damages, and although pain and suffering is not assumed, "[a] trial court is within its much discretion in awarding damages ... where there is the smallest amount of evidence of pain on the part of the deceased by his actions or otherwise." Pierre v. Lallie Kemp Charity Hosp., 515 So.2d 614, 619 (La.App. 1 Cir.), writ denied, 515 So.2d 1111 (La.1987). However, such an award must be rejected absent any indication of conscious suffering by the deceased. Id.
Peggy Sue Schexneider suffered from different types of seizures. Some were mild and of short duration. Others were more *512 severe, rendering her totally unconscious for minutes at a time. The defendant argues that Peggy Sue suffered a severe seizure while taking her bath, was rendered unconscious before her face was immersed in the water, and therefore sustained no conscious pain and suffering prior to death. The plaintiffs argue that the evidence mandates a contrary conclusion.
The testimony is conflicting on this point. Peggy Sue had been given her medication by Ms. Gracie Johnson, an employee of Pinecrest, at approximately 8:10 p.m. on the evening of her death. Ms. Johnson was the resident supervisor of the unit where Peggy Sue resided. She was the last person to see Peggy Sue alive and was the person who discovered her body approximately thirty minutes after administering the medication. Ms. Johnson described the position of the body as being "kind of sloped forward ... on the left side with her face [submerged] in the water." When Ms. Johnson discovered the body, the water was still running into the bathtub and had risen up to the safety drain, or approximately six inches from the top of the tub. Ms. Johnson testified that there was no water on the floor next to the bathtub.
The plaintiffs presented the testimony of Dr. Thomas V. Bertuccini, a Lafayette, Louisiana neurosurgeon. Based on his review of Peggy Sue's seizure history for the preceding four years, he concluded that it was extremely unlikely Peggy Sue suffered a seizure prior to her face being immersed in the water.[1] The doctor reached this conclusion based on his statistical analysis of the odds of Peggy Sue having a seizure at any given moment. Dr. Bertuccini suggested that those odds were expressed in a fraction of one percent. The doctor suggested there were other events which could have preceded Peggy Sue's death wherein she would have remained conscious, would have been aware she was drowning, and would have suffered fear and panic. However, in relation to his opinion, the doctor was asked:
Q.... Do you have an opinion to any degree of medical certainty that is more probable than not that the decedent drowned in this case, other than as a result of a seizure?
A. No.
He admitted that he has no way of knowing whether she was or was not conscious after getting into the tub other than his evaluation of the mathematical probabilities based on the circumstantial evidence available to him. He simply considered the possibility of a seizure "extremely unlikely."
Dr. Emil Laga, a New Iberia, Louisiana forensic pathologist, testified for the plaintiffs and also suggested it was very unlikely that Peggy Sue suffered a seizure while in the bathtub. However, his opinion was based on what he considered to be the lack of evidence of a seizure in the records made available to him.
The defendant's expert, Dr. Barbara J. Golden, a Baton Rouge, Louisiana child neurologist, reached a different conclusion. She stated:
[I]t is certainly my opinion ... that it is by far most likely that a seizure lead to her drowning event in that a seizure was in part a cause of her death, although drowning was the immediate cause of that death.
Her opinion was based upon Peggy Sue's history of uncontrollable seizures, the findings contained in the death certificate, and her own review of studies which suggested that seizures are an overwhelming cause of adult drownings in bathtubs where there is no history of drug or alcohol involvement.
Dr. Thomas G. Easterling, the resident physician at Pinecrest, had personally seen Peggy Sue in a prolonged seizure. Because her medication level was below her therapeutic level, it was his opinion there was a better chance for seizures. According to the doctor, the intent of maintaining a level of medication lower than that which might be necessary to control the seizures was to improve the quality of life of the patient.
*513 The trial court was presented with all of this evidence and concluded there was no evidence to establish that Peggy Sue experienced any pain and suffering in the accident. This is a finding of fact, and we may not set it aside in the absence of manifest error. Rosell, 549 So.2d 840. We find no manifest error in the trial court's denial of the survival action.

Court Costs
The trial of this matter began on September 29, 1993, and ended on October 1, 1993. At trial, Dr. Bertuccini testified that the charge for his trial testimony was $2,700.00. Dr. Laga testified that the charge for his trial testimony was $2,500.00. On October 22, 1993, the plaintiffs filed a motion requesting that the court set the expert witness fees of the two doctors. In response to this motion, two ex parte orders were signed. One was signed by Judge Donald T. Johnson of the Ninth Judicial District Court on October 25, 1993. This order set the fees at $250.00 for each physician. However, this order contains the notation "Void" followed by the initials "GCM," apparently being the initials of Judge George C. Metoyer, Jr., the presiding judge at trial. A second order was signed by Judge Metoyer on the same day setting the physicians' trial witness fees at $1,000.00 each.
On November 2, 1993, an ex parte motion was filed by the plaintiffs to tax certain deposition expenses as costs. The record contains a number of filings associated with this motion. A hearing was ultimately held on the issue of deposition expenses on April 4, 1994, and the trial court recognized only the expenses associated with the deposition of Lou Guidry. By order signed April 11, 1994, that amount was taxed as costs. This decision is not contested by the plaintiffs. Rather, the plaintiffs argue that on April 25, 1994, pursuant to a discussion in chambers, the trial court reduced the court costs by $1,000.00, or one half of the amount awarded in his order of October 25, 1993.
La.R.S. 13:5112(A) requires that court costs assessed against the state or any political subdivision thereof be expressed as a dollar amount in a judgment or appellate court decree. The final judgment on the merits was signed on April 25, 1994. It contains a paragraph assessing $1,989.30 in court costs to the defendant. That number appears in pen and replaces the typed number $3,848.08, which was crossed out. Adjacent to the new amount appears the initials of the attorneys for the parties. The plaintiffs contend that while in chambers, a discussion was had concerning costs. The plaintiffs argue in brief that the original number ($3,848.08) was properly reduced by the costs relating to an intervention and by certain filing fees attributable to the defendant. They contend that it was further reduced improperly by $1,000.00.
La.R.S. 13:3666(B) provides the authority for payment of additional compensation to expert witnesses:
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.
(2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause.
We interpret this statute to require the trial court, without request of any party to the litigation, to set expert witness fees where the expert testifies as to the time and value of his or her services. If the expert does not supply the trial court with time and value testimony, the prevailing party may, after judgment is rendered, file a contradictory rule to set the expert's fee. We find nothing in the statute that would preclude either party from reminding the trial court in advance of judgment of its obligation to set expert fees pursuant to La.R.S. *514 13:3666(B)(1). We conclude that plaintiffs' filing of October 22, 1993, was such a reminder and required no contradictory hearing.
In this case, Dr. Bertuccini and Dr. Laga testified as to the fees charged for trial testimony, and based on that testimony, the trial court set those fees at $1,000.00 for each physician. Once fixed by the order of October 25, 1993, that award could not be amended by the trial court to change its substance. La.Code Civ.P. art. 1951. Therefore, if the judgment on the merits reduced the awarded expert fees by $1,000.00, that reduction was improper. Rather than remand for further proceedings, we choose to amend the judgment to reflect that the court costs calculated at the trial level should include the full $2,000.00 awarded by the order of October 25, 1993.
The plaintiffs also contend that even the $2,000.00 award was insufficient in view of Dr. Bertuccini's and Dr. Laga's testimony that their charges were $2,700.00 and $2,500.00, respectively. However, we note that amounts awarded for expert fees are generally within the trial court's discretion and will not be disturbed unless there is an abuse of that discretion. Antis v. Miller, 613 So.2d 1034 (La.App. 3 Cir.1993). We do not find that the trial court abused its discretion in setting the expert witness fees.

DISPOSITION
The judgment of the trial court is amended to reflect that court costs taxed against the Louisiana Department of Health and Hospitals include the full $2,000.00 initially taxed as expert witness fees by the trial court by order dated October 25, 1993. The judgment of the trial court is affirmed in all other respects. Costs of this appeal are taxed equally between the plaintiffs, Evans and Shirley Schexneider, and the defendant, the Louisiana Department of Health and Hospitals. Pursuant to La.R.S. 13:5112, we set forth the total cost of this appeal as $174.00.
AFFIRMED IN PART AND AMENDED IN PART.
NOTES
[1] According to Dr. Bertuccini, the Pinecrest records revealed that Peggy Sue had suffered twenty-six reported seizures in 1988, twenty-seven in 1989, fifty-nine in 1990, and eighty-seven in 1991.