671 So.2d 1074 (1996)
Ethel JONES, Individually and on behalf of James W. Guin, Plaintiff-Appellee,
v.
STATE, Through the DEPARTMENT OF HEALTH AND HOSPITALS and Pinecrest Developmental Center, Defendants-Appellants.
No. 95-1130.
Court of Appeal of Louisiana, Third Circuit.
March 27, 1996.
*1075 John Edward Morton, Alexandria, for Ethel Jones et al.
John H. Ayres, III, Baton Rouge, for State of La. Thru Dept. of Health & Hosp. et al.
Before THIBODEAUX, SAUNDERS and SULLIVAN, JJ.
SULLIVAN, Judge.
This wrongful death suit arises out of the disappearance of a mentally and physically handicapped resident of Pinecrest Developmental Center (Pinecrest). On September 24, 1993, James Guin vanished near the cottage where he lived with fifteen other Pinecrest residents; to this date, his whereabouts and fate remain a mystery. His mother, Ethel Jones, sued the state through the Department of Health and Hospitals (DHH) and Pinecrest, alleging that Pinecrest employees failed to provide her son with an appropriate level of supervision and security. The trial court agreed and awarded Mrs. Jones $150,000.00, individually, for the wrongful death of her son and $150,000.00, as administrator of Guin's estate, in survival damages. DHH and Pinecrest appeal.

*1076 DISCUSSION OF THE RECORD
James Guin, who resided at Pinecrest for thirty-three years, suffered from numerous mental and physical infirmities. Although his chronological age was forty-seven, his mental age was between three and four years. He required medication daily to control epileptic seizures; he was totally blind in his right eye, legally blind in the left; and he walked with a shuffling gait, often wearing a helmet to protect against head injuries from frequent falls.
At 4:55 p.m. on September 24, 1993, the resident training specialists (RTSs) assigned to his cottage reported Guin missing when he failed to appear for dinner. Law enforcement authorities conducted an exhaustive three day search, using bloodhounds, helicopter patrols and the services of many volunteers. Yet, this effort revealed no trace of Guin's whereabouts.
Guin lived in cottage 411 with fifteen other residents of various mental and physical abilities. Usually, four RTSs were assigned to that cottage for the 2:00 to 10:00 p.m. shift; however, only three reported to work on the day of the disappearance. In addition to supervising the residents, the RTSs were also responsible for household chores such as doing laundry and setting the table for meals.
Before his disappearance, Guin attended a music therapy class that ended at 3:40 p.m. The music teacher, Kathryn Block, saw Guin standing by the patio door at 3:45 p.m. as he waited to go outside to smoke his pipe. Millie Napoleon, the home manager for cottage 411, noticed that Guin was still inside the building at 4:00 p.m. when she dispensed the evening medication to cottage residents. She testified that at approximately 4:45 p.m. she inquired as to Guin's whereabouts and that Linda Slaughter, an RTS, told her that Guin was smoking his pipe on the patio. Slaughter testified that at 4:45 p.m., she opened the patio door and saw Guin sitting with several other residents. Another RTS, Yvonne Austin, however testified that she had been on the patio from approximately 4:30 to 4:45 p.m. and Guin was not on the patio during that time. In fact, Austin stated that she had not seen Guin since 2:00 p.m. that afternoon when she first reported for duty.
Dr. Paul Ware, a specialist in psychiatry and neurology, testified on behalf of the plaintiff. In Dr. Ware's opinion, Pinecrest employees failed to supervise Guin at the level required by his particular infirmities and by his individualized care plan. Dr. Ware testified that Guin's mental and physical limitations required that he be under "constant supervision," a term of art meaning that the client must at all times be directly observed by his caretaker. However, Dr. Ware found no evidence that Guin was directly observed by any employee in the late afternoon hours of September 24, 1993. The next, less restrictive level is "close supervision," which requires the caretaker to observe the client at least every fifteen minutes. In Dr. Ware's opinion, the care provided Guin on the date of his disappearance did not even reach the "close supervision" level.
Dr. Ware also estimated that there is only a five percent chance that Guin is alive today. He based this opinion on Guin's inability to care for himself and the length of time he has been missing, but most importantly upon Guin's dependence upon anti-seizure medication. Dr. Ware estimated that, considering the amount of medication needed, Guin would automatically fall into seizures forty-eight hours after the medication was stopped. He expected that death would follow in three to five days. However, Dr. Joe Hirsch, who treated Guin, testified that death would not necessarily follow the cessation of his medication. Absent foul play, Guin would have more likely died of exposure than seizures, in Dr. Hirsch's opinion.
Ancel Irby, director of security at Pinecrest since 1986, testified that the security measures in effect at the time were inadequate to protect residents such as Guin. The Pinecrest grounds consist of 400 acres containing client homes and administration buildings surrounded by another 400 acres of unused wooded border. Approximately five miles of paved road traverse the facility. When Guin disappeared, only one security officer was on patrol for the entire Pinecrest campus. The facility has one entrance open to the public that, until 1989, was manned daily by a guard from 8:00 a.m. until 4:30 p.m. Chief Irby opposed the discontinuance *1077 of the manned front gate, and over the years he made his opinion known to Pinecrest administrators. He firmly believed that an attendant at the front entrance was vital to the safety of Pinecrest residents, and, in his opinion, an abduction or the unauthorized removal of a client was inevitable once the entrance was no longer guarded. Although no client had ever been abducted from Pinecrest, Chief Irby was aware of two incidents in which an intruder attacked a client and an employee. Chief Irby's concerns were echoed by the plaintiff's other administrative security expert, Byron Arbeit.
Edwin Wright, administrator of Pinecrest, vigorously defended the actions of his employees and the decision to discontinue manning the front entrance. He disputed that Guin required "constant supervision," noting that Guin's care plan stated he could walk freely, without assistance, near the homes on the grounds. The RTSs who supervised Guin daily and the professionals who developed his care plan uniformly testified that Guin could safely sit unattended on his cottage patio for approximately fifteen minutes and that Guin had never in the past attempted to wander or to leave the grounds.
Wright also testified that the removal of the guarded entrance was consistent with the policy of "normalization," which strives to mainstream developmentally disabled clients and to remove any barriers between them and the community. Dr. John Matson, a psychologist testifying on behalf of the defense, stated that a manned guardhouse is not an acceptable standard in 1995 and is inconsistent with the goal of integrating the developmentally disabled with the community. Dr. Matson acknowledged that "normalization" involved a tradeoff between safety and liberty and that in some instances security would be sacrificed to the goals of that policy.
In written reasons, the trial judge found that (1) the plaintiff proved the certainty of Guin's death, considering his condition at the time of his disappearance; (2) Pinecrest did not provide adequate supervision and security measures to Guin, with both instances of substandard conduct contributing to his disappearance; (3) the removal of the security guard at the entrance of the facility was an operational act and, therefore, not subject to the discretionary immunity of La.R.S. 9:2798.1; and (4) that the plaintiff suffered a total of $300,000.00 in damages. DHH and Pinecrest assign five errors on appeal.

PROOF OF DEATH
Defendants first contend that the plaintiff has not established the certainty of Guin's death, as required by La.Civ.Code art. 30. That article provides:

Art. 30. Presumption of Death
When a person has disappeared under circumstances such that his death seems certain, his death is considered to have been established even though his body has not been found.
Defendants argue that any theory concerning Guin's death is mere speculation because his fate is unknown. They further argue that the medical testimony suggests a significant chance of survival, specifically Dr. Hirsch's statement that death would not necessarily result from that cessation of medication and Dr. Ware's estimate that there is a five percent chance that Guin is alive.
The present Article 30 was enacted in 1990 with an effective date of January 1, 1991. The Revision Comments state that this article is new, and the derivation table lists no source articles in earlier editions of the Civil Code. However, the jurisprudence has long recognized that "death, like all other facts, may be established by circumstantial evidence." Boyd v. New England Mut. Life Ins. Co., 34 La.Ann. 848, 850 (1882). Additionally, in the prior law concerning absent persons, former La.Civ.Code art. 60 permitted the heirs of an absentee to take provisional possession of his estate prior to the expiration of five years upon a showing "that there are strong presumptions that the person absent has perished." Former La.Civ. Code art. 61 instructed the judge to "take into consideration the motive of the absence and the reasons which may have presented the absentee from being heard of."
Relying on these codal provisions, the court in Deal v. Bell Fish Co., 674 F.2d 438 (5th Cir.1982), permitted the spouse of a missing seaman to sue for his wrongful death after he had disappeared from a vessel sixty *1078 miles offshore. However, in Bennett v. Equitable Life Assur. Soc. of United States, 180 La. 238, 156 So. 290 (1934), the court found the facts insufficient to support a conclusion of death where the absent person, while suffering from tuberculosis, left home ten years earlier with the sum of $200.00, intending to find work in another state. The absentee's physician testified that it was equally possible that his former patient was either dead or alive.
In interpreting the present Article 30, we turn to the revision comments, which state:
(b) This provision determines the standard of proof in cases in which a person disappeared under circumstances that make his death a certainty, yet his body has not been found. Under this provision, the death of a person is proved by a preponderance of the evidence.

(Emphasis added.)
We first note an apparent inconsistency between Article 30's required circumstances such that "death seems certain" and the statement in the comments that death is proved by a preponderance of the evidence. We leave this question for another day because we find that, in the instant case, the plaintiff's proof is beyond a mere preponderance: the circumstantial evidence presented negates any reasonable hypothesis that Guin is still alive.
The trial judge found that Guin's survival would be "slim if not impossible considering his medical and cognitive impairments." This conclusion is supported by the testimony of Dr. Ware and by those who cared for Guin daily.
The plaintiffs have established Guin's complete dependence upon others and his need for life-saving medication. Unlike the absentee in Bennett, 156 So. 290, Guin was neither able-bodied nor capable of supporting himself. He had the intelligence of a three year old, was legally blind and required anti-seizure medication daily. To conclude that Guin is alive requires an assumption that someone is presently caring for his physical and medical needs. Such an hypothesis is not reasonable. We find no merit in defendant's first assignment of error.

LIABILITY
Defendants next argue that the trial court erred in failing to apply the case of Mundy v. Department of Health & Human Resources, 620 So.2d 811 (La.1993), concerning the duty of an owner or operator of a facility to protect persons on the premises from unforeseen criminal acts of third parties. Defendants argue that, under Mundy, they should be absolved from liability because Guin's assumed criminal abduction was unforeseeable.
The trial court ruled against defendants on two theories: negligent supervision and inadequate security measures. The trial court did not make a finding that Guin was abducted. The trial court formulated the duty of a developmental center such as Pinecrest in caring for the cognitively impaired as one of "reasonable care in a safe and secure environment, taking into account the mental and physical needs of each resident."
The standard of care applied by the trial court is similar to that announced by the supreme court in Daniels v. Conn, 382 So.2d 945 (La.1980), a case in which Pinecrest was also a defendant:
A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care to a particular patient depends upon the circumstances and the facts of the case.
Id. at 949 [quoting Hunt v. Bogalusa Medical Ctr., 303 So.2d 745, 747 (La.1974)].
In Daniels, the supreme court held that Pinecrest's duty to supervise an adult resident with a mental age of seven years encompassed the risk that the resident might be struck by an intoxicated driver on the facility's grounds.
Mundy, involved a hospital's duty to protect one of its employees, not to protect a patient entrusted to its care. We agree with *1079 the plaintiff that the instant case should be governed by Daniels.
The trial court found that the supervision provided Guin was inadequate and that this conduct contributed to his disappearance. These findings are not manifestly erroneous. Guin's plan of care does not specify the level of supervision that he required in his home area. Edwin Wright, Pinecrest's administrator, testified that Guin, like all other Pinecrest residents, was under "general supervision." However, this term does not appear in any of Guin's care plans, and it does not take into account Guin's particular needs, as required by Daniels, 382 So.2d 945.
The RTSs testified that Guin could sit on the patio unattended for "a few minutes;" yet, the record shows that they failed to follow even this vague standard on the day Guin disappeared. Between 4:00 and 4:45 p.m., Guin was not under anyone's direct observation, and only once during this time were his whereabouts questioned. We find no error that this supervision was inadequate for a resident who was legally blind and who had a history of head injuries from frequent falls. Defendants contend that Guin disappeared within ten minutes of his last sighting between 4:45 and 4:55 p.m. This scenario, however, is only possible if Millie Napoleon and Linda Slaughter were correct about the time that Slaughter saw Guin on the patio. Their testimony is disputed by Yvonne Austin, who stated that Guin was not on the patio from 4:30 to 4:45 p.m.
We also find that the scope of the duty to supervise Guin in accordance with his particular mental and physical needs included the risk that he might come to harm as the result of his condition (falling or wandering into the wooded perimeter of the facility) as well as from third persons on Pinecrest grounds. See Daniels, 382 So.2d 945. In McGillivray v. Rapides Iberia Management Enterprises, 493 So.2d 819 (La.App. 2 Cir. 1986), the court stated that the purpose of this duty is to protect patients who are physically able to move about but who are mentally incapable of detecting danger. Guin, described as a friendly person who liked to initiate conversations with others, would not have appreciated the risk of harm from a stranger. Defendants argue that the RTSs are not security officers; yet considering the minimal security that Pinecrest provided (one officer on patrol for the 400 acre campus), the RTSs were the only personnel capable of preventing such harm. Further, the risk of harm at the hands of a third person was not unforeseeable. Although no Pinecrest client has been abducted, on two occasions intruders physically attacked an employee and a client.
Because we find no error in the trial court's ruling on the plaintiff's negligent supervision claim, we deem it unnecessary to discuss whether Pinecrest should have provided a twenty-four hour manned front entrance and whether the discontinuance of the security guard is subject to the discretionary immunity of La.R.S. 9:2798.1.

QUANTUM
Defendants next contend that the awards of $150,000.00 for Guin's wrongful death and $150,000.00 for his pain and suffering are excessive, considering Mrs. Jones infrequent visits with her son in later years and the lack of evidence of any pain and suffering sustained by Guin.
A reviewing court should not disturb the trial court's award of general damages absent an initial determination that the trial court abused its great discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___U.S.___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the supreme court described the trier of fact's discretion as "`great,' and even vast, so that an appellate court should rarely disturb an award of general damages." The supreme court further stated:
It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id.
Upon review of the record, we find no abuse of discretion in the award to Mrs. *1080 Jones for the wrongful death of her son. Guin was Mrs. Jones' oldest of five children. Although he lived at Pinecrest for thirty-three years, the record reveals that he visited his family frequently and that he figured prominently in family holiday celebrations. Mrs. Jones' visitation with her son decreased only because of her poor health. Nonetheless, she still participated in Guin's care at Pinecrest. Just months before his disappearance, and in spite of her ill health, she actively campaigned to have him removed from a cottage where she believed other residents were abusing him. Since his disappearance, her physical health has steadily declined and her grief has been prolonged because his body has not yet been found.
In a strikingly similar wrongful death case, Schexneider v. Louisiana Department of Health & Hospitals, 95-32 (La.App. 3 Cir.6/14/95); 660 So.2d 508, this court affirmed the award of $150,000.00 to each parent of a mentally retarded adult resident of Pinecrest. The parents' visits had decreased because their daughter would become violent upon their departure, but they continued to show great interest in their daughter's care and progress.
We also find no abuse of discretion in the damages awarded for Guin's survival action. Damages for pain and suffering are properly awarded if there is a scintilla of evidence of any suffering or pain on the part of the deceased by his actions or otherwise. Prince v. Mattalino, 583 So.2d 541 (La.App. 3 Cir.1991). The pain and suffering of a deceased are not assumed; nonetheless, awards in survival actions have been upheld as within the trial court's discretion even in the absence of testimony of the deceased's pre-death pain. In Dent v. Perkins, 629 So.2d 1354 (La.App. 4 Cir.1993), writ denied, 634 So.2d 853 (La.3/18/94), the parents of an infant who lived only thirty-six hours were permitted to recover for the child's pain and suffering even though the child did not appear to be conscious after birth and there was no movement detected. See also Brown v. Department of Transportation, 604 So.2d 99 (La.App. 3 Cir.1992).
In the instant case, Dr. Ware explicitly described the symptoms that would follow once Guin stopped receiving his anti-seizure medication. After noting that Guin received daily twice the average therapeutic dose, Dr. Ware stated that Guin would "automatically" fall into seizures within forty-eight hours after the dosage was stopped. The next stage would be "status epilepticus," with one seizure following another accompanied by difficulty in breathing because of secretions accumulating in the throat. Dr. Ware expected that death would not follow for another two to three days. He also believed that Guin's suffering would be increased because of fear and his mental inability to understand the situation. The two other causes of death posited by Dr. Ware are no less painful: a combination of starvation and dehydration or murder at the hands of an abductor, probably after sexual abuse.
In Prince, 583 So.2d 541, this court affirmed a jury award of $100,000.00 for the pre-death pain and suffering of a child who lapsed into seizures for twenty-four hours before being declared brain dead. The court in Prince relied upon expert testimony that seizure victims "are often frightened and anxious, as if they had just awakened from an nightmare." In In re Medical Review Panel Bilello, 621 So.2d 6, 12 (La.App. 4 Cir.), writ denied, 629 So.2d 1139 (La.1993) the court stated, "Fright, fear or mental anguish while an ordeal is in progress is legally compensable." In Bilello, a child suffered less than twenty-four hours as fluid accumulated around his heart before his death. The court affirmed a jury award of $125,000.00 for the child's physical and mental suffering during this time period. Considering the above, we find that the trial court's award in Guin's survival action, although high, was within an acceptable range for the injuries of this particular plaintiff. Youn, 623 So.2d 1257.

NEW TRIAL
Defendants next contend that the trial court erred in denying their motion for a new trial. The basis of the motion was that Honorable Donald Johnson did not have the authority to preside over this case on April 25, 1995 because by order of the Ninth Judicial District Court dated January 3, 1995 all *1081 civil cases in pretrial status in Judge Johnson's division, "A," were reallotted to another division upon Judge Johnson's transfer to the criminal bench. In briefs, defendants suggest they were unaware of this order until after trial, while the plaintiffs claim that all parties consented to trial before Judge Johnson.
We find no abuse of discretion in the denial of defendants' motion for new trial. Local Rule 11(E) of the Ninth Judicial District Court provides that a judge of the civil division may continue to dispose of civil matters while in the criminal section, provided the criminal duties shall take preference over the disposition of civil matters. Thus, notwithstanding the order of January 3, 1995, we cannot conclude that Judge Johnson no longer had authority to try this case.

DECREE
For the above reasons, the judgment rendered in favor of Ethel Jones, individually and on behalf of James W. Guin, is affirmed. Costs of this appeal are assessed to defendants-appellants, the State of Louisiana through the Department of Health and Hospitals and Pinecrest Developmental Center.
AFFIRMED.