759 So.2d 896 (2000)
Donald JAMES, Individually and on Behalf of his minor children, Demond, Desmond, Donnie and Donald Gant
v.
Sheriff Wayne JONES, St. John Sheriff's Office, Juan Watkins and Coregis Insurance Company.
No. 99-CA-966.
Court of Appeal of Louisiana, Fifth Circuit.
March 22, 2000.
*897 Gus A. Fritchie, III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, Louisiana, Attorney for Defendants/Appellants.
William D. Grimley, Baton Rouge, Louisiana, Attorney for Plaintiffs/Appellees.
Panel composed of Judges CHARLES GRISBAUM, Jr., EDWARD A. DUFRESNE, Jr., and SOL GOTHARD.
*898 GOTHARD, Judge.
This suit involves an automobile accident which occurred on December 15, 1997. Deborah Ann Johnson James was killed when the automobile she was driving was struck by an automobile driven by Lt. Juan Watkins of the St. John the Baptist's Sheriff Office. The plaintiffs in this suit are Donald James, husband of the decedent, individually and on behalf of decedent's minor children, Demond and Desmond James, and decedent's major children, Deonne Duhe and Donald Gant. Named as defendants in the suit were Lt. Juan Watkins, St. John the Baptist Parish Sheriff's Office, (Lt. Watkins' employer) and Coregis Insurance Company, (the liability insurer of the Sheriff's Office). After trial by judge, the court found that Officer Watkins was 70% at fault and Mrs. James was 30% at fault in the cause of the accident. The trial court rendered judgment on March 12, 1999 in favor of plaintiffs, and found damages as follows:
Donald James: past lost earning capacity $17,439 ×.70 = $12,207.30; future lost earning capacity $109,337.45 × .70 = $76,536.22; other special damages $10,458.65 ×.70 = $7,321.06; and general damages of $200,00.00 × .70 = 140,000.00.
Decedent's pain and suffering: $50,000.00 apportioned $8,750.00 to each of the decedent's children ($50,000.00 ×.70 ÷ 4).
Desmond and Demond James (minor children): General damages of $150,000.00 × .70 = $105,000.00
Deonne Duhe and Donald Gant (major children): General damages of $100,000.00 × .70 = $70,000.00.
The trial court further provided interest from date of judgment.
On March 29, 1999, after rule to show cause, the trial court amended the judgment to reduce the general damage awards pro rata by 4.7619%, and to limit the general damage awards to the $500,000.00 statutory cap of liability against political subdivisions as provided by La. R.S. 13:5106, infra. The trial court also amended the judgment to award judicial interest from date of judicial demand on all items except past and future economic loss.
Defendants have appealed, and plaintiffs have filed an answer to the appeal. For the following reasons, we affirm the decision of the trial court.
The trial judge provided extensive reasons of judgment, which contain detailed findings of fact. Finding no manifest error in these findings of the trial court, and because they are so meticulously reasoned, we adopt those findings as our own:
REASONS FOR JUDGMENT
Deborah Ann Johnson James, a loving and loved wife and mother, died the evening of December 15, 1997, from an 8:50 p.m. collision between the Hyundai Sonata she was driving and a Ford Crown Victoria driven by deputy sheriff Lt. Juan Watkins in the course and scope of his employment. Mrs. James's husband Donald, their two minor children, Demond and Desmond, and her two major children, Dionne G. Duhe and Donald Gant, sue the sheriff, his insurer Coregis, and Lt. Watkins for damages.
Lt. Watkins was traveling north about 59 mph[1] on U.S. 51 near LaPlace, *899 emerging from under the elevated I-10 West and approaching the intersection of 51 with I-10 West's down ramp. He intended to continue north on 51 to back up another officer on a "Code One" call to investigate a suspicious person in an isolated area near the parish boundary near Manchac. A code one call is a low-priority category that does not authorize the answering officer to exceed speed limits. And, when an officer is authorized to exceed speed limits, regulations ordinarily oblige him to use his emergency rooftop lights and audible warning signal.
Mrs. James, coming home from work near New Orleans, had just exited the I-10 West at the U.S. 51 down ramp, intending to cross the northbound lanes of 51 and make a left turn to go south on 51. Two stop signs controlled that intersection, obliging traffic from the I-10 down ramp to stop for U.S. 51 traffic (and, of course, to remain stopped until 51 was sufficiently clear of traffic as to allow safe entry and, if desired, crossing).
Mrs. James's car left no skid marks before the collision, which occurred in the inside northbound lane of 51. Lt. Watkins' car left 81' of skid marks in that lane (including the "shadow" marks from earliest tire-gripping of the road surface), before it hit Mrs. James's car broadside at the driver's door, causing Mrs. James profound injuries including an aortic laceration which caused her death. Death was pronounced at River Parishes Hospital at 9:28 p.m.
Lt. Watkins's speed of 59 mph exceeded the 45 mph limit of the collision area, his rooftop emergency lights were not flashing (though he apparently did have his high-beam, bright lights on[2]), and his siren or other audible warning signal was not sounding, and he had no authorized justification for that unwarned speed in a 45 mph zone.
Yet alsohowever sympathetic we may be for Mrs. James and her loving family, and however difficult it may be for them to explain or understandMrs. James herself was not free from serious driving error. The fact that a collision did occur, the length of the skid marks left by Lt. Watkins's car, and the distances and directions the vehicles traveled after the collision, all together show that, in violation of the duties imposed upon her by the stop sign, Mrs. *900 James did, for whatever reason, from whatever cause, drive directly into the path of Lt. Watkins's car on the favored highway 51.
Lt. Watkins was, I find, a credible witness notwithstanding his inability to recall some details of this terrible night. His testimony is to the effect that Mrs. James did not stop, that she was moving fast enough for him to notice her car when she was about 5 or 10 feet before the stop sign, and that she did not slow down at any time before he hit her.[3]
Mrs. James's speed at impact was calculated by both expert witnesses at approximately 15 mph, and the distance from the stop sign to impact was 38 feet. The time that it took Mrs. James to go from the stop sign to impact can therefore also be calculated, although that time differs, of course, depending on what her speed was on leaving the stop sign: whether she had stopped and thus started from 0 mph (requiring 3.4 seconds to reach impact), or she had only slowed, and started from some modest speed such as, say, 5 mph (requiring 2.6 seconds to impact), or 10 mph (2.07 seconds), or 15 mph (1.72 seconds).
I conclude, after painstaking, repeated consideration of all the evidence, that Mrs. James did not stop but continued past the stop sign at a moderate speed, probably between 10 and 15 mph.[4]

*901 Plaintiff counsel well argues, and I agree, that, if Lt. Watkins had been traveling the 45 mph limit, this accident would not have happened irrespective of Mrs. James's speed leaving the stop sign. But defense counsel equally well argues, and I agree it is also true, that, if Mrs. James had both stopped at the stop sign and then waited until her path was clear across favored highway 51, this accident would not have happened.
I conclude that each driver's failure to observe his or her applicable legal duty was fault, and that each driver's fault was a "but for" cause-in-fact contribution to the collision; and that such a collision was within the scope of the risks intended to be protected against, both by Lt. Watkins's duty to travel no more than 45 mph on that particular part of the favored highway, and also by Mrs. James's duty to stop and await safe entry into that highway.
The law provides that each must bear the percentage of the damages attributable to his or her fault, and obliges the trier of fact, in this case this judge, to decide what percentage each is responsible for.
Considering the factors set forth in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), I conclude that, while each driver's fault was a serious and very threatening fault, and there appears no excuse for either, a greater percentage must be assigned to excessive, unwarned speed. As to Watson, factor (1), it is difficult to suppose that a driver faced with a stop sign at a highway would not be aware of the danger of moving out into a lane of superior highway traffic. Arguably, however, she might be somewhat slightly less aware than someone driving 60 in a 45 zone on that highway. As to (2), the greatness of the risk of the two conducts seems similar, though again somewhat greater for the speeder. As to (3), the significance of what was sought by the conduct, that factor arguably slightly favors Lt. Watkins, whose worthy if imperfect intent was to afford backup rapidly to a police officer going to an isolated area to investigate a suspicious person call, while Mrs. James was only going home after her workday (which had lasted, apparently, to about 8 p.m.). As to (4), the capacity of professional police officer Lt. Watkins was presumably greater than that of layperson Mrs. James to appreciate the dangers. And factor (5), like factor (3), may slightly favor Lt. Watkins in that a minimally extenuating circumstance may have prompted, though not justified, speeding (but not its lack of warning) that otherwise would not have occurred. As to the additional Watson consideration of the relationship of the nature of the conduct to the harm caused, I find Lt. Watkins's speed significantly more directly related to and a greater determinant of the seriousness of this accident.
All things considered, I conclude a reasonable apportionment is, and I so find, that Lt. Watkins was 70% at fault and Mrs. James 30% at fault in this accident.
On appeal, the defendants allege that:
1. While the trial court made correct factual findings, it erred in apportioning Deborah James with only *902 30% fault, when it was her grossly negligent act of running two stop signs in the face of Lt. Watkins' vehicle only 165 feet to her left that started the chain of events culminating in the accident; and,
2. The trial court erred in awarding damages for Deborah James; conscious pain and suffering when not one scintilla of evidence was introduced to prove that she consciously suffered or exhibited signs of suffering before she died.
Plaintiffs also appealed, and they allege that:
1. The trial court was in error in finding the deceased at fault;
2. The trial court was in error in finding that the statutory cap of $500,000.00, La. R.S. 13:5106, is applicable to Coregis, the liability carrier and to Juan Watkins;
3. The awards of general damage were abusively low and constitute an abuse of the trial court's discretion; and,
4. The trial court was in error in awarding legal interest form the date of judgment instead of from the date of judicial demand.

COMPARATIVE NEGLIGENCE
In their first allegation of error, defendants contend that while the trial court made correct factual findings, it erred in finding that Mrs. James was only 30% at fault in the cause of the accident. Plaintiffs contend that the trial court erred in assessing any percentage of fault against Mrs. James.
The law is well settled that the allocation of fault is a factual determination and subject to the trial court's great discretion. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607; Hughes v. Bossier Parish School Bd., 32,225 (La.App. 2 Cir. 10/29/99), 745 So.2d 816. Because apportionment of fault is a finding of fact, the manifestly erroneous/clearly wrong standard is applicable in reviewing apportionments of fault. Crews v. Babin, 98-931 (La.App. 5 Cir. 3/10/99), 732 So.2d 551. The appellate court may only reapportion fault if it finds the trial court was clearly wrong or manifestly erroneous, even if the Court of Appeal would have decided differently had it been the trier of fact. Hebert v. Brown Bottling Group, Inc., 98-0924 (La.10/30/98), 719 So.2d 1043.
In this matter, after careful review of the record before us and considering the reasons as expressed by the trial court above, we cannot say that the trial judge was manifestly erroneous or clearly wrong in apportioning fault at 70% to Lt. Watkins and 30% to Mrs. James.

STATUTORY CAP
In this allegation of error, the plaintiffs allege that the trial judge erred in applying La. R.S. 13:5106 which provides for a statutory cap of $500,000.00 in suits against a political subdivision, applicable to Lt. Watkins and to Coregis, the insurer of the St. John the Baptist Parish Sheriff's Office.
La. R.S. 13:5101 et seq. is known as the "Louisiana Governmental Claims Act." La. 13:5106(B) provides in part that:
(2) In all suits [against the state or a state agency or political subdivision] for wrongful death of any one person, the total amount recoverable, exclusive of property damages, medical and related benefits and loss of earning or loss of support, and loss of future support ... shall not exceed five hundred thousand dollars.
This limitation is clearly applicable to Lt. Watkins, who was employed by St. John the Baptist Parish Sheriffs Office and acting in the course and scope of his employment at the time of the accident. La. R.S. 13:5101(B) provides that:
B. This Part applies to any suit in contract or for injury to person or property against the state, a state agency, an officer or employee of the state or a *903 state agency arising out of the discharge of his official duties or within the course and scope of his employment, or a political subdivision of the state, as defined herein, or against an officer or employee of a political subdivision arising out of the discharge of his official duties or within the course and scope of his employment. The provisions of this Part shall not supersede the provisions of R.S. 15:1171 et seq. Nothing in this Part shall apply to claims covered by R.S. 40:1299.39.
We also agree with the trial judge that the $500,000.00 statutory cap is applicable to Coregis Insurance Company.
In Carbon v. Allstate Ins. Co., 97 3085 (La.10/20/98), 719 So.2d 437, 439-440, the Louisiana Supreme Court once again reiterated the applicable law regarding interpretation of insurance policies:
An insurance policy is a contract between the parties. It should be construed by using the general rules for the interpretation of contracts as set out in the Civil Code. The role of the judiciary in interpreting insurance contracts is to ascertain the common intent of the parties to the contract. A court is to determine the intent of the parties to an insurance contract "in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning." An insurance policy should not be interpreted in an unreasonable manner, such as to enlarge coverage beyond what is reasonably contemplated by the terms of the policy. (Citations omitted).
The policy of insurance between the Coregis Insurance Company in favor of the St. John the Baptist Parish Sheriff's Office and in effect at the time of the accident at issue provided in part that "Agreement E: Auto Liability ... COVERAGE ... we agree to pay those sums the Insured must legally pay, or the Named Insured has contracted to pay, for: damages, direct and consequential: and expenses."
Applying the general rules of contract construction to this case, we find that the liability of Coregis, as the insurer is limited to that of its insured. Because liability against the insured is limited to $500,000.00 by R.S. 13:5106, recovery against the insurer, Coregis, is likewise limited to that amount. Compare, Descant v. Administrators of Tulane Educ. Fund, 93-3098 (La.7/5/94), 639 So.2d 246.

DAMAGES
The trial court awarded "Survivorship General Damages" of $50,000.00, reduced by 30% for plaintiff's fault, reasoning that "Mrs. James's death from a lacerated aorta was swift. But I believe her moments, even just seconds, of terrifying crash and pain would justify damages of $50,000.00." Defendant alleges that is was error as there was no evidence to support a finding that Mrs. James suffered before she died.
Defendant's expert testified that Mrs. James would have been aware of the oncoming police vehicle and therefore aware that a collision was imminent. Under the facts of this case, we cannot say that the trial court was clearly wrong in its award.
The trial court awarded general damages of $200,000.00 to the surviving spouse, $150,000.00 each to the two minor children and $100,000.00 each to the major children. Plaintiffs allege that these awards for general damages were abusively low.
As in all factual determinations, in the assessment of damages the trier of fact is left which much discretion, and this court may not disturb an award of damages absent a clear abuse of that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). "It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient." Reck v. Stevens, 373 So.2d 498, 501 (La.1979). Furthermore, *904 this court must "review the evidence in the light which most favorably supports the judgment to determine whether the trier of fact was clearly wrong in its conclusions". Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The discretion afforded the trier of fact in a damage award is "great, and even vast, so that an appellate court should rarely disturb an award of general damages". Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Considering the facts of this case and the standard of review as stated above, we find no error in the trial court's award of damages.

JUDICIAL INTEREST
It is correct that the trial judge, in his original judgment of March 12, 1999, awarded legal interest only from date of judgment. However, in his amended judgment of March 29, 1999, the trial judge acknowledged that his original judgment was in error and he awarded legal interest from date of judicial demand on all items of damages except loss of earning capacity and economic benefit. Accordingly, this allegation of error presents nothing for us to review.

CONCLUSION
The judgment of the trial court is affirmed. All costs are assessed equally between defendants and plaintiffs.
AFFIRMED.
GRISBAUM, C.J., CONCURS IN PART; DISSENTS IN PART.
GRISBAUM, C.J., CONCURRING IN PART; DISSENTING IN PART.
I agree with the majority's opinion in all respects except for its decision to affirm the trial court's award of survivorship general damages. The trial judge stated in his reasons for judgment that the award was for "moments, even just seconds of terrifying crash and pain." Although not specifically stated as such, this award was clearly for the decedent's pre-death suffering, as such damages were alleged in plaintiffs petition, and possibly also for preimpact fear.
The law is clear that parties may only recover damages for pre-death suffering when they prove that the deceased actually suffered prior to dying. "Where there is no indication that the decedent consciously suffered any pre-death pain, an award cannot be made to the survivors for pain and suffering." Poynor v. Cure, 443 So.2d 1151 (La.App. 5th Cir.1983), writ denied 446 So.2d 1225 (La.1984) (quoting Addison v. Travelers Insurance Company, 281 So.2d 805 (La.App. 1st Cir.1973)).
I find that the record does not support an award for pre-death suffering. The majority relies on a defense expert's testimony to conclude that Ms. James "would have been aware of the oncoming police vehicle and therefore aware that a collision was imminent." The record does not show such a conclusion by any witness. Moreover, this state's jurisprudence requires more evidence to support an award for pre-death suffering.
The record shows that Ms. James died of a lacerated aorta, which is generally known to cause imminent death. The record further shows that the accident occurred at approximately 8:50 p.m. and that Ms. James was pronounced dead at River Parishes Hospital at 9:23 p.m. Therefore, at the most, Ms. James lived for thirty-three (33) minutes after the accident. Several people came in contact with Ms. James during the last moments of her life; however, the plaintiffs did not call one witness to testify that Ms. James exhibited signs of pain and suffering either at the accident scene or during the transport to the hospital. Also, significantly, no experts testified that Ms. James was even aware that an accident was about to occur.
Because the appellees did not introduce any evidence at trial to indicate that Mrs. James consciously suffered before she died, they did not prove entitlement to *905 damages for pre-death suffering. Thus, I find the trial judge erred in awarding these damages, and in accordance with this state's jurisprudence, I would reverse the award. See Poynor v. Cure, 443 So.2d 1151 (La.App. 5th Cir.1983); Siemann v. Teston, 517 So.2d 242 (La.App. 1st Cir. 1987); Blanchard v. Rodrigue, 340 So.2d 1001 (La.App. 1st Cir.1976), writ denied 341 So.2d 1129 (La.1977), writs denied 341 So.2d 1130 (La.1977); Addison v. Travelers Ins. Co., 281 So.2d 805 (La.App. 1st Cir.1973) (all reversing trial courts' awards of pre-death suffering damages).
NOTES
[1] He testified his speedometer read 60 mph shortly before he realized Mrs. James's car was entering his path, and both plaintiff and defense witnesses presented as experts calculated 59 mph (by first calculating the postcrash speed of his spinning car, and then, from his pre-crash skid marks, its pre-braking speed). Plaintiffs' excellently qualified mechanical engineer, Prof. Andrew J. McPhate, was qualified by this court only in that field, including dynamics, as able to do time-speed-distance calculations, but not as an "accident reconstruction" experta title he himself did not claim. However, he estimated at .8 rather than measured (as the defense witness did, using an accelerometer, at .75) the applicable pre-crash coefficient of friction, and he used 90 feet as the pre-crash braking distance notwithstanding that the skidmarks measured 81 feet (including "shadow"). And he testified of the extent of the damage to the two automobiles as consistent with his speed estimates, and of psychological or environmental factors which might affect judgment, all of which seem outside his expertise, and probably would not have been allowed in a jury trial.

Defendants' witness John Painter, although his degrees in criminal justice and administration would not qualify him as expert even in time-distance-speed calculations, has considerable practical experience including three years as a National Transportation Safety Board highway accident investigator, and many courses or seminars in related areas as student and teacher of the Traffic Institute affiliated with Northwestern University.
Defendants challenged Prof. McPhate's expertise, and plaintiffs challenged Mr. Painter's. Defendants cited Wilson v. Woods, XX-XXXXXX (U.S. 5 Cir. Jan. 13, 1999); which upheld a trial judge's Daubert rejection of a mechanical engineer as an "accident reconstruction" expert, but also questioned "`this Northwestern Traffic Institute" and, specifically, its correspondence courses. I expressed doubt of each witness's qualification to deal with "accident reconstruction," but in this non-jury trial I allowed each to give testimony of his methods and calculations of times, speeds, and distances.
I now note that Mr. Painter's more concentrated practical experience seems to qualify him more for our purposes than does Prof. McPhate's broader engineering experience. Overall I place greater credibility in Mr. Painter's measures, calculations and opinions on speeds (although for the most part they do not vary greatly from those of Prof. McPhate).
[2] The forensic record showed one high beam filament's burnt up and broken condition resulted from collision shock while burning (although its glass envelope was not broken). The other high beam lamp was so destroyed by the collision that neither filament nor its post-ends were present. I deem it more probable than not that they were on before braking, rather than turned on in the middle of braking for a panic stop.
[3] I add that I do not disbelieve the testimony of Lt. Watkins and Kenner detective Thomas Powell that an unknown person almost immediately after the accident told them Mrs. James passed his car and entered 51 without stopping. That person left the scene without identifying himself. I give no probative value to the statement of an unknown person not subject to cross-examination or personal credibility evaluation. (Powell exited I-10 West shortly after Mrs. James, but did not see whether she stopped, because there were two cars just in front of him in the two ramp lanes, and two more towards the two stop signs.)
[4] If Mrs. James had started from a stop, or 0 mph, it would take her 3.4 seconds to reach a speed of 15 mph (22 feet per second) and impact 38 feet away. During the last 1.1 seconds of that 3.4, Lt. Watkins had to be actually braking, because (with a .75 coefficient of friction) that is how long it would take him to brake from 59 mph to his 41 mph impact speed in 811 (which the skidmarks show he traveled while braking). In the first 2.3 seconds of Mrs. James's 3.4 seconds, he would travel 1991 at 59 mph (86.53 feet per second). That 1991 plus 81' of skid marks would place him a total distance of 280 feet away from the impact at the time Mrs. James left the stop sign. 2.3 seconds is slightly more, by .3 or .66 of a second, than the 2 seconds (McPhate) or 1.64 seconds (Painter) pre-braking perception and reaction time the experts deemed necessary for a previously unalerted driver to perceive a danger and react to it. That might show added negligence by Lt. Watkins, but it would not clear Mrs. James of negligence.

If Mrs. James did not come to a stop, but was already moving 5 mph when she reached and left the stop sign, it would have taken her only 2.6 (instead of 3.4) seconds to reach 15 mph and impact. Lt. Watkins again must use the last 1.1 seconds of that 2.6 seconds to travel the 81' skid-marked braking distance before impact; and in the earlier 1.5 seconds, at 59 mph or 86.53 fps, he would travel 129.81, or 1301, which added to the 811 skid places him 2111 from the stop sign as Mrs. James leaves. That 1.5 seconds is slightly less than the 2 seconds, or at least 1.64 seconds, required to perceive and react to danger by braking.
If Mrs. James was traveling 10 mph as she passed the stop sign, the time for her to reach 15 mph and impact is calculated at 2.07 seconds, which would place Lt. Watkins at 165 feet from impact, at the moment Mrs. James passes the stop sign. 2.07 seconds, less 1.1 of skidding time, would mean that Lt. Watkins had only 1.03 seconds to perceive the danger and react. 1.03 seconds is below even Mr. Painter's 1.64 perception and reaction time for an unalerted driver. It is, however, within the .64 seconds he said a driver already alerted to danger would require to move his foot from gas to brake. Lt. Watkins testified that he had been watching Mrs. James's car approaching 51, but did not realize she was not stopping until she was about 5 or 10 feet from the stop sign.
If Mrs. James is traveling 15 mph as she leaves the stop sign, it takes her only 1.72 seconds to reach impact, 38 feet from the stop sign. Of that 1.72 seconds, again Lt. Watkins is using the last 1.1 seconds in braking the 811 before impact; and during the earlier .62 seconds he would travel only about 541, making his total distance from impact only 1351 at the moment Mrs. James's car passed the stop sign. Most important, in that .62 seconds, even though he was already alerted by having seen Mrs. James coming off the ramp, he would have been just a shade under the .64 seconds that Mr. Painter testified even an alerted driver would require to take his foot off the gas pedal and apply his brakes.
I do not suppose that these calculations amount to a scientific confirmation or proof of Lt. Watkins's testimony that he anticipated that Mrs. James's car was not going to stop when it was still about 5 or 10 feet away from the stop sign. But his is the only eye-witness testimony we have, and I find him credible.
I conclude that, considering all of the evidence we have available, I cannot find Mrs. James free of fault; I find it more probable than not that she did not stop, but passed the stop signs, and at a speed of some 10 to 15 miles per hour, and was a significant cause of this tragic accident.