799 So.2d 569 (2001)
Angela Harvey, Wife of/and Bruce HARVEY, Sr. Individually and as the Natural Tutrix and Tutor of Aundrenica Harvey, Alisha Harvey, Andrell Harvey, Ashley Harvey and on Behalf of the Estate of the Deceased, Bruce Harvey, Jr.
v.
STATE of Louisiana, the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 2000-CA-1877.
Court of Appeal of Louisiana, Fourth Circuit.
September 26, 2001.
Rehearing Denied November 30, 2001.
*572 Eric M. Ferrouillet, Kevin J. Katner, Ferrouillet Law Firm, P.L.C., and Bernard J. Bagert, Jr., The Bagert Law Firm, P.L.C., New Orleans, LA, Counsel for the Plaintiffs/Appellees.
Richard P. Ieyoub, Attorney General, Raul R. Benomo, Helen H. Babin, Pamela L. Hershey, Special Assistants Attorney General, New Orleans, LA, Counsel for the Defendant/Appellant.
Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge JAMES F. McKAY, III, and Judge DENNIS R. BAGNERIS, Sr.
BYRNES, Chief Judge.
The defendant, State of Louisiana, through the Department of Transportation and Development ("DOTD"), appeals a judgment in favor of the plaintiffs, Angela and Bruce Harvey, Sr., and their children, where the driver, Bruce Harvey, Sr., failed to negotiate a curve on the highway in a one-vehicle accident. We affirm.
At approximately 12:15 a.m., on August 19, 1991, Bruce Harvey, Sr. was driving a Subaru station wagon on La. Highway 47 with the passengers, his wife Angela Harvey, and their five children, Aundrenica, Alisha, Andrell, Ashley and Bruce, Jr. There was a reverse warning sign with a 40 mph advisory speed plate, as well as the railroad advance sign placed ahead of the accident area. Four chevrons delineated the curve.
Bruce Harvey, Sr. testified that on Sunday, he and his family went to Pointe-a-la-Hache to visit his mother. The Harveys left to return to New Orleans at approximately 10:45 p.m., and Bruce Harvey, Sr. drove until 12:15 a.m. on early Monday morning when the accident occurred. Bruce Harvey, Sr. was driving with his low beam lights on, and it was very dark. He did not see the reverse curve warning sign with the 40 mph speed sign that was located on the highway before a train warning sign. He saw the train warning sign but he did not see the first of four chevron signs warning of the curve until he was already into the curve. The vehicle went off the highway, overturned, rolled over, and landed on its wheels. The roof was crushed.
After the accident, the Harveys were taken to Humana Hospital. Bruce Harvey, Sr. submitted to a blood test for the police at the hospital. The test confirmed that he had not used alcohol or drugs prior to the accident. At the hospital, the two-year-old son, Bruce, Jr. died approximately one hour after the accident. Later Angela Harvey was transferred to Meadow Crest Hospital where she under surgery, including cervical fusion, and then *573 she went to Touro Infirmary for physical therapy and rehabilitation.
In May 1992, Angela and Bruce, Sr. filed a petition individually and on behalf of the remaining children and Bruce, Jr.'s estate. After a bench trial in October 1998, the trial court found that the DOTD was 50 percent at fault and Bruce Harvey, Sr. was 50 percent at fault in the July 7, 1999 judgment. The trial court awarded the Harveys damages in the amount of $902,643.39, subject to the applicable comparative fault reduction, together with legal interest and costs. The DOTD's appeal followed.
On appeal the DOTD contends that the DOTD: (1) was not at fault for placement of the warning signs; and (2) was not given actual or constructive notice under La. R.S. 9:2800. The DOTD further argues that: (3) the damages were excessive.

Liability
The DOTD contends that the plaintiffs failed to prove by a preponderance of the evidence that the placement of the warning signs caused or contributed to the accident under the guidelines of the Manual on Uniform Traffic Control Devices ("MUTCD").
The DOTD has the duty of constructing and maintaining its highways in a condition that is reasonable, safe and does not present an unreasonable risk of harm to persons exercising ordinary care and reasonable prudence. Usry v. Louisiana Department of Highways, 402 So.2d 240 (La.App. 4 Cir.1981), writ denied, 404 So.2d 1259 (La.1981). The breach of a duty is a question of fact, or a mixed question of law and fact, and the reviewing court must accord great deference to facts found and inferences drawn by the finder of fact. Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225. Causation is a question of fact and the trier of fact's determinations are entitled to great weight and cannot be disturbed absent manifest error. Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276 (La.1991); Anglin v. White, 572 So.2d 779 (La.App. 4 Cir.1990).
Although deference is accorded to the fact finder, the reviewing court has a constitutional duty to review facts, not merely to decide whether the reviewing court would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221. Where there are two permissible views of evidence, the fact finder's choice between them cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989). The trier of fact is vested with assessing the witnesses' credibility. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987).
The DOTD maintains that the evidence did not establish any violation of the MUTCD. La. R.S. 32:235(E) provides that proof that any state, parochial, or municipal authority was, at the time of any act complained of, in compliance with the provisions of the department's traffic control device manual shall be prima facie evidence of discharge by such authority of its obligations to the motoring public. Cooke v. Travelers Ins. Co., 590 So.2d 657 (La.App. 3 Cir.1991), writ denied, 592 So.2d 414 (La.1992).
The DOTD notes that the trial court found the DOTD did not follow the manual, which required that: (1) multiple warnings should not interfere with one another; *574 (2) signs warning of roadway curves should be visible at night from 500 feet; and (3) two chevron signs should be visible at all times. The DOTD maintains that the trial court misinterpreted the manual's recommendations.
The DOTD also asserts that although Bruce Harvey, Sr. claimed he never negotiated the curve as it existed on the night of the accident, he testified that he had traveled on this road 50 to 60 times prior to the accident. The driver also had traversed the highway going to visit his mother six hours before the return trip to New Orleans so that he was aware of the railroad tracks in the curve.
Dr. Joseph Blaschke testified as an expert in the field of traffic engineering, highway design, and accident reconstruction on behalf of the DOTD. He inspected the accident scene in August 1995 when the chevrons were no longer posted. He could not disagree with the plaintiff's expert's findings as to the placement or location of those signs. The DOTD's expert pointed out that the highway had four lanes and a fog lane. The lanes had clear, reflective markings. On the highway, the wide traffic lanes were open and unobstructed. According to Blaschke, the only sign present at the night of the accident that was mandated by the MUTCD was the railroad advance warning sign. Chevrons were not mandated by the manual.
The railroad advance warning sign was posted 435 feet from the railroad crossing in conformity with the manual. The reverse curve warning sign with a 40 mph advisory speed plate, was located 75 feet from the start of the curve. Dr. Blaschke opined that the curve could have been safely negotiated at a 40 mph speed, and the reflective paint and markers on the highway would have appeared well illuminated and delineated to the attentive driver traveling at that speed. There was no history of accidents on that roadway. Dr. Blaschke testified that there were no design features of the highway or placement of signs that contributed to this accident, and that the accident was caused solely by driver error.
The DOTD states that Bruce Harvey, Sr. admitted that he failed to see the reverse curve sign and the speed advisory limit sign that were placed before the railroad sign. The four chevrons were located after the railroad sign. Although Bruce Harvey, Sr. claimed to have been traveling at 35 to 40 mph, the DOTD refers to the plaintiff's expert Dr. Olin Dart's acknowledgement that the estimated speed of the vehicle was approximately 55 mph when it went off of the road.
The plaintiffs point out that Bruce Harvey, Sr. usually crossed the Mississippi River bridge and took that west bank route to his mother's house. Because of ongoing construction, Bruce Harvey, Sr. took the alternate east bank route on the day of the accident. He testified that he was not familiar with the highway, which was a new roadway with barrels and barricades after the bridge over the Intra Coastal Waterway in the direction of Chef Menteur Highway. He had not driven on that highway at night for several years, and there was no lighting on the roadway.
Bruce, Sr. explained that the old roadway had been a straight two-lane road between the Intra Coastal bridge and Chef Menteur Highway, whereas the new roadway had four lanes and had winding curves. Bruce Harvey, Sr. had traveled in that area but he had never traveled on that same roadway since it was reconstructed. When he saw the sign warning of a railroad crossing, he looked straight ahead, looking for the crossing. Before reaching the crossing, he encountered a curve that he was unable to negotiate.
*575 Dr. Olin Dart, an expert in the field of traffic engineering, testified on behalf of the plaintiffs. His associate took measurements and pictures of the road in August 1991 in the daytime. Dart reviewed the scene at night in May 1992. He found no negligence with the traffic sign configurations as they appeared in daylight, but he found that the DOTD's placement of the warning signs was defective at night with the vehicle's lights on low beam. When Dart drove in the area of the accident at night, he could not see the first chevron as he approached the curve with the low beam lights. Dart found that the position of the chevrons were in violation of the manual.
The DOTD avers that Dart acknowledged that Section 2C-11 of the MUTCD states that the chevron should be visible at 500 feet, and that this implies the use of high beams because the low beams do not have a 500 foot visibility capacity. However, the plaintiffs point out that the high beam lights would not have helped since Dr. Dart did not see the first chevron until he was already into the curve. Dr. Dart testified that the high beams would not have illuminated the chevron because the light would have fallen to the right of the chevron. The chevrons were too far to the left. The manual does not require that the driver needed to drive with high beams on, but suggests that the driver needs a 500 foot warning. It could be understood that the warning sign should appear, be visible or located 500 feet before the beginning of the curve. The plaintiffs assert that when Blaschke inspected the accident site four years later, it is unknown if the inspection was done at night. Further, the chevrons had been removed. There is no showing that it was a traffic violation to drive with low beam lights at night. The DOTD maintains that a reasonable individual would have driven with high beams lights where the road was dark and there was no oncoming traffic.
Dr. Dart explained that multiple warning signs should not interfere with one another. The placement of the smaller chevron sign in close proximity to the railroad sign created a conflict that impaired and diminished the warning effect that the chevron sign had. The MUTCD at 2A-21 states that "Signs requiring different decisions by the vehicle operator must be spaced sufficiently far apart for the required decision to be made safely. The safe spacing shall be determined in units of time as determined by the expected vehicle approach speed."
Dr. Dart testified that the railroad warning sign and the chevron curve warning sign require different decisions by the vehicle operator. The decision to locate the crossing to avoid any train requires that the driver look ahead and drive straight for the crossing, whereas the decision to locate and negotiate a curve would require that he should prepare to turn into a curve. The railroad crossing sign was located ahead of the chevron although the curve preceded the railroad crossing. According to Dart, the placement of the signs in close proximity disrupted the driver's sequencing decisions.
Dr. Dart also testified that the chevron lights were not visible at a sufficient distance to adequately warn a motorist of a curve. The first chevron sign came into view too late at the beginning of the curve itself.
Dr. Dart further stated:
... [T]here should have been two [chevrons] in the field of view at any time. And as pointed out, not only were there not two in the field of view but even one was difficult to see and could not be seen at night.
*576 Dr. Dart found that the fact that two chevrons could not be viewed at once was contrary to the manual. Dr. Dart concluded that at night the highway presented an unreasonable risk of harm to drivers of reasonable prudence.
Considering the conflicting evidence, the fact finder's choice between them is not manifestly erroneous. In its reasons for judgment, the trial court stated that: "A motorist who approaches a curve which is followed by a crossing is required to make two critical driving decisions in rapid sequence." The DOTD breached its duty to warn motorists by improperly placing the signs. The trial court was not clearly wrong in finding that the sign placement was improper so that the DOTD was 50 percent at fault for the accident. We find that the trial court was not manifestly erroneous in reasoning that Bruce Harvey, Sr. was also 50 percent comparatively at fault for traveling over the speed limit and for not driving as safely as he could without using the high beam lights at night.

Notice
The DOTD contends that the trial court erred in assessing any fault to the State because the plaintiffs presented no evidence of either constructive or actual notice of the defective condition as required by La. R.S. 9:2800.
Prior to the enactment of 1995 La. Acts, Nos. 1328 and 828, La. R.S. 9:2800 conflicted with the State's waiver of sovereign immunity pursuant to La. Const. art. XII, sec. 10(A). Thus, La. R.S. 9:2800 was unconstitutional until November 23, 1995, the effective date of the acts. Under the 1995 enactment, the legislature had the constitutional power to provide the extent of liability of the state, including the circumstances giving rise to liability. Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14. Because the law was substantive in nature, it could not be applied retroactively to cases arising prior to its effective date. Id. Prior to that date, the plaintiff need not prove that the state had constructive or actual notice of the defect.
In the present case the accident occurred on August 19, 1991, prior to the November 1995 effective date of the 1995 La. Acts, Nos. 1328 and 828, which mandated the notice requirement for the State's liability under La. R.S. 9:2800. The notice requirements of La. R.S. 9:2800 do not apply to this case.

Damages
The DOTD contends that the damage award is excessive.
Damages awarded by a trial court are to be reviewed in the light most favorable to the prevailing party. O'Riley v. City of Shreveport, 30,107 (La.App. 2 Cir. 01/23/98), 706 So.2d 213, writ denied, 98-0752 (La.5/1/98), 718 So.2d 418. General damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors which affect the victim's life. Glasper v. Henry, 589 So.2d 1173 (La.App. 4 Cir.1991), writ denied 594 So.2d 1315 (La.1992).
The discretion vested in the trier of fact is "great", and even vast in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), certiorari denied sub nom. Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). When damages are insusceptible of precise measurement, much discretion is left to the court for its reasonable assessment. La. C.C. art. 1999; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Only after the appellate court determines that the trial court clearly *577 abused its discretion in awarding damages to an injured party in a personal injury case, may the appellate court resort to looking at prior awards in cases with generically similar medical injuries for purposes of determining the highest or lowest point at which damages are reasonable. Reck v. Stevens, 373 So.2d 498 (La.1979); Youn, supra. The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991).

Survival Damages
The DOTD maintains that the trial court erred in awarding $35,000 as survival damages for the death of Bruce Harvey, Jr. in the absence of any evidence supporting this claim. The DOTD refers to Baudoin v. Acadia Parish Police Jury, 620 So.2d 453 (La.App. 3 Cir.1993), writ denied, 626 So.2d 1166 (La.1993), in which the Third Circuit found that if it is shown that the person was probably unconscious when she suffered a fatal injury, the survivors are not entitled to recover for the decedent's pain and suffering. Damages for pain and suffering may be awarded if there is evidence of any pre-death pain or suffering on the part of the deceased by his actions or otherwise. Temple v. Liberty Mut. Ins. Co., 330 So.2d 891 (La.1976).
In Mathieu v. State, Dept. of Transp. and Development, 598 So.2d 676 (La.App. 3 Cir.1992), writ denied, 600 So.2d 665 (La.1992), the Third Circuit found that damages for pain and suffering are proper if there is a scintilla of evidence of any pre-death pain or suffering by the deceased. Severity and duration of pain is considered in an award for pain and suffering. Perez v. State, Through Dept. of Transp. and Development, 578 So.2d 1199 (La.App. 4 Cir.1991), writ denied, 581 So.2d 706 (La.1991). Damages for pain and suffering in a survival action may include the decedent's pre-impact fear. Guillot v. Valley Forge Ins. Co., 99-1044 (La.App. 3 Cir. 12/8/99), 753 So.2d 891. Like other general damage awards, the amount of the award for the decedent's pain and suffering is subject to the vast discretion of the trier of fact. Magee v. Pittman, 98-1164 (La.App. 1 Cir. 5/12/00), 761 So.2d 731, writ denied, XXXX-XXXX (La.9/22/00), 768 So.2d 31, and writ denied, XXXX-XXXX (La.9/22/00), 768 So.2d 602.
In Jones v. State, Through Dept. of Health and Hospitals, 95-1130 (La.App. 3 Cir. 3/27/96), 671 So.2d 1074, writ denied, 96-1040 (La.5/31/96), 674 So.2d 263, the Third Circuit held that pain and suffering of the deceased are not assumed, but awards in survival actions are within the trial court's discretion, even in the absence of testimony of the decedent's pre-death pain. In that case the court applied the statutory presumption of death arising from the disappearance of a mentally and physically handicapped resident of a developmental center.
In Dent v. Perkins, 629 So.2d 1354 (La. App. 4 Cir.1993), writ denied, 94-0116 (La.3/18/94) 634 So.2d 853, the parents of an infant who lived only thirty-six hours were permitted to recover for the child's pain and suffering even though the child did not appear to be conscious after birth and there was no movement detected.
The decedent's moments, even just seconds, of a terrifying crash and pain justified survivorship general damages in the amount of $50,000 reduced by the percentage for plaintiff's fault in James v. Jones, 99-966 (La.App. 5 Cir. 3/22/00), 759 So.2d 896.
*578 In the present case, the coroner's report gave the time of death of Bruce Harvey, Jr. at 1:30 a.m., which shows that he lived for over an hour after the accident. The coroner's diagnosis was "depressed fracture of skull, contusions of lungs, lacerated liver, multiple lacerations, abrasions, contusions [and] congenital heart disease." The injuries were severe and fatal. More probably than not, Bruce Harvey, Jr. was conscious and experienced pain and suffering for at least for a few moments when he first received his fatal injuries. Bruce, Jr.'s pain and suffering included his preimpact fear experienced when the vehicle continued to roll over, the roof was crushed, the vehicle landed upright on its wheels, and Bruce, Jr. came to rest underneath the vehicle.
It is uncertain how long Bruce, Jr. remained conscious in the process of dying, but it is certain that he was conscious for some time when he was initially injured so that he suffered severe pain and suffering from the injuries. The trier of fact did not abuse its vast discretion in awarding $35,000 for the deceased's pain and suffering prior to death under Youn, supra.

Angela Harvey's Pain and Suffering
The DOTD also claims that the record does not support the $350,000 award for pain and suffering to Angela Harvey. The judgment awarded the following damages to Angela Harvey:

Pain and Suffering $350,000.00
Past Medical Expense $ 62,452.37
Disability $ 75,000.00
 ___________
 TOTAL: $487,452.37

In its reasons for judgment, the trial court noted that:
Angela Harvey suffered a spinal cord injury with immediate right-sided weakness, an umbilical hernia, left abdominal lesion and a C4-5. As a result of the injuries, Ms. Harvey received a two-level cervical fusion with wiring of C3-5, right posteria iliac graph and h[a]lo, for which she was hospitalized for a month. Ms. Harvey testified to painful and prolonged physical therapy. At the time of trial, she did not have full strength on one side of her body and she has permanent scars. Her physician concluded that she runs a risk of further injury and degenerative disease due to her two-level fusion.
The witnesses who testified included Angela Harvey, Dr. Frank Culicchia, an expert in the field of neurological surgery, who performed the cervical fusion; and Dr. Gary Glynn, an expert in physical therapy and rehabilitation, who treated Angela Harvey after her surgery. The witnesses' testimony supports the trial court's findings. The fact finder did not abuse its vast discretion in allocating $350,000 for Angela Harvey's pain and suffering under Youn, supra.
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.